IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

NICK J. PAPPAS )
)
v. ) No. 3:13-1055
) Judge Trauger/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:  The Honorable Aleta A. Trauger, District Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's applications for disability insurance benefits and disabled widower's benefits, as provided under Title II of the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 13), to which defendant has responded (Docket Entry No. 17). Plaintiff has further filed a reply brief (Docket Entry No. 18) and defendant has filed a sur-reply (Docket Entry No. 21). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 11),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

## I. Introduction

Plaintiff filed his claim to benefits on May 6, 2010, alleging that he became disabled on February 28, 2008, as a result of lower back problems, high blood pressure, heart problems, thyroid problems, and a nerve condition in his hand and chest. (Tr. 204) His claim was denied at the initial and reconsideration stages of state agency review, whereupon plaintiff filed a request for *de novo* hearing and decision by an Administrative Law Judge (ALJ). An administrative hearing was held on May 3, 2012, at which plaintiff appeared with counsel. (Tr. 44-108) Plaintiff testified, as did an impartial vocational expert. At the conclusion of the hearing, the ALJ closed the record and took the matter under advisement, until June 6, 2012, when he issued a written decision in which plaintiff was found to be not disabled. (Tr. 21-43) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2009.

2. It was previously found that the claimant is the unmarried widower of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widower's benefits set forth in section 202(g) of the Social Security Act.

3. The claimant has not engaged in substantial gainful activity since February 28, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

4. The claimant has the following severe impairments: Alcoholism; Adjustment Disorder, status post bereavement; Personality Disorder, not otherwise specified; Polysubstance Dependence, in sustained full remission (20 CFR 404.1520(c)).

5. Notwithstanding the claimant's alcohol use, he does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).

6. After careful consideration of the entire record, I find that, based on all of the impairments, including the substance use disorders, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is unable to sustain concentration and persistence for a minimum of two hours at a time, even for simple and unskilled work, nor is he able to reliably make simple work-related judgments or decisions. Moreover, he would be reasonably expected to take unscheduled breaks and/or be absent from work secondary to his symptoms of mental functioning, as exacerbated through his alcohol use. As a result, he would be mentally unable to sustain an eight-hour work day on a regular and continuing basis.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

8. The claimant was born on September 21, 1956 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

9. The claimant has at least a high school education or its equivalent and is able to communicate in English (20 CFR 404.1564).

10. The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above (20 CFR 404.1568).

11. Considering the claimant's age, education, work experience, and residual functional capacity based on all of the impairments, including the substance use disorders, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

12. If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

13. If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).

14. If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He would only be able to understand, remember, and carry out simple and detailed instructions of one to four steps, but is able to maintain concentration, persistence and pace for two hours at a time, with normal breaks, in performing tasks which meet these parameters.

15. If the claimant stopped the substance use, the claimant would continue to be unable to perform past relevant work (20 CFR 404.1565).

16. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

17. If the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c) and 404.1566).

18. The substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance use (20 CFR 404.1520(g) and 404.1535). Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from February 28, 2008, through the date of this decision.

(Tr. 24, 27, 29-31, 33, 36-38)

On August 7, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-6), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the

4

record as a whole, then those findings are conclusive.  Id.

## II.  Review of the Record

The following summary of the record is taken from defendant's brief, Docket Entry No. 17 at 2-9:

### A. Medical Evidence of Physical Impairments

In 2004, an x-ray of the lumbar spine showed possible compression fracture of uncertain age involving the L1 vertebral body, associated reversal of the usual lordotic curvature, and evidence of degenerative disc disease (Tr. 577). It is not clear why this x-ray was ordered because the next dated medical record is from 2007 (*see* Tr. 308).

In late 2007, Pappas reported back pain following a car accident; his treatment regimen included medication and physical therapy (Tr. 256-66, 279-88, 315).

Between March 2008 and March 2012, Pappas visited the Premier Medical Group or Covenant Family Practice for a variety of complaints (*see* Tr. 366-80, 414-51, 457-70, 510-29, 544-67). These medical records include routine follow-ups, medication refills, and treatment for isolated conditions, such as ear pain, cellulitis of the buttock, low magnesium levels, and several skin conditions (*see* Tr. 374, 376, 414, 417, 424, 431, 435, 438, 442, 457, 510, 544-67).

Since March 2008, it appears that Pappas reported back pain as his chief complaint at two sessions, in October 2011 and April 2012 (Tr. 513, 523). He reported chronic back pain during a Review of Systems (ROS) examination at several sessions (Tr. 420, 457, 462, 510, 517, 526), but denied any back pain during a ROS examination at other sessions (Tr. 414, 416, 424, 427, 431, 435, 438, 442, 445, 467, 563). On the two occasions where Pappas reported back pain as a chief complaint, clinical findings included a slowed and stooped gait, decreased range of motion, pain during range of motion, and tenderness (Tr. 515, 525). On these two occasions, the treatment regimen included medication, back exercises, and applying moist heat (Tr. 515-16, 525). At other sessions, clinical findings included a normal gait, normal range of motion, and normal strength and tone (Tr. 416, 419, 422, 426, 429, 433, 440, 444, 447, 459, 464, 469, 512, 519, 528).

Since March 2008, medical records show treatment for benign essential hypertension or labile hypertension (Tr. 366, 368, 420, 424, 427, 431, 435, 438, 442, 445, 457, 462, 510, 517).[3] A stress test from May 2009 was "probably normal" as there was "no consistent pattern of

decreased uptake to suggest ischemia or infarct;" the ejection fraction was 66% with normal wall motion (Tr. 394). Medical records state that the test was "normal except hypertensive response" (*see, e.g.*, Tr. 442). With the exception of stray references to trace edema or bulging varicosities, cardiovascular examinations were normal (Tr. 367, 369, 373, 375, 377, 379-80, 416, 419, 422, 426, 429, 433, 440, 444, 447, 459, 464, 469, 512, 515, 519, 522, 525, 528). Pappas's treatment regimen included medication, decreased consumption of alcohol, exercise, and reduced sodium intake (*see* Tr. 422-23, 430, 434, 437, 440, 444, 448, 460, 465, 512). In August 2010, a physician at the Premier Medical Group stated that Pappas was last examined in February 2009 and that Pappas had no limitations due to chest pain (Tr. 575-76).

Since March 2008, it appears that Pappas reported foot pain as his chief complaint at one session, in February 2010 (Tr. 427). Pappas stated that the pain was primarily in his heel and that this pain began one or two months earlier (Tr. 427). The precipitating event was excessive walking (Tr. 427). Pappas characterized the pain as intermittent, moderate severity, and aching; the pain increased with dorsiflexion and initial weight bearing, and improved with walking (Tr. 427). A physical examination showed a normal gait, normal range of motion, and normal strength and tone (Tr. 429). Pappas was diagnosed with plantar fasciitis and prescribed an anti-inflammatory drug (Tr. 429-30). Since that session, it does not appear that Pappas reported heel pain as his chief complaint at any later session (Tr. 414, 417, 420, 424, 457, 462, 467, 510, 517, 523, 526), and no physician appeared to identify plantar fasciitis as an official diagnosis (Tr. 416, 419, 422, 426, 460, 465, 469, 512, 515, 519, 522, 525, 528). With the exception of the sessions where Pappas reported back pain or broke his toe, physical examinations showed a normal gait, normal range of motion, and normal strength and tone (Tr. 416, 419, 422, 426, 459, 464, 469, 512, 519, 528).

Pappas is approximately 6 feet, two inches tall (*see, e.g.*, Tr. 366, 512). Since March 2008, Pappas has weighed between 246 and 267 pounds (Tr. 366, 368, 372, 374, 376, 380, 416, 418, 422, 426, 429, 433, 436, 439, 443, 446, 459, 464, 469, 512, 515, 519, 522, 524, 528). Some medical records have referred to Pappas as moderately obese (Tr. 422, 427, 429, 433, 459, 464, 469, 528) or mildly obese (Tr. 512, 519). At one of the sessions where Pappas reported back pain, the medical record stated that Pappas's history was significant for obesity (Tr. 513).

## B. Medical Evidence of Mental Impairments and Alcohol Abuse

Between March 2008 and April 2009, treatment records from the Premier Medical Group or Covenant Family Practice do not appear to show any complaints of a mental impairment (Tr. 366, 368, 370, 372, 374, 376, 378, 380).

6

Between May 2009 and August 2010, ROS examinations showed that Pappas reported feelings of stress after his wife had an unsuccessful procedure for pancreatic cancer (Tr. 420, 424, 427, 431, 435, 438, 442, 445). Mental status examinations showed a stressed and anxious mood/affect, intact recent and remote memory, and good insight and judgment (Tr. 422, 426, 429, 433, 440, 444, 447). Two mental examinations during this period showed an appropriate affect and demeanor and grossly normal memory (Tr. 416, 419). In May 2009, Pappas was diagnosed with situational stress with anxiety and prescribed Ambien (Tr. 447-48); in June 2010, he was diagnosed with acute grief reaction and prescribed Xanax (Tr. 422-23).

During this period, treatment records state that Pappas was a "current alcoholic" and was not in any treatment (Tr. 415, 418, 421, 425, 428, 432, 436, 439, 443, 446). At one point, Pappas was drinking on a regular basis and he drank on average 1.3 liters of hard liquor every night (*see*, *e.g.*, Tr. 446), although other records suggested that he reduced his drinking to four ounces daily (Tr. 438, 442) or 250ml per day (Tr. 420, 424, 427, 431). His treatment regimen suggested that Pappas discontinue or decrease his alcohol consumption (Tr. 423, 430, 434, 437, 448). Pappas was diagnosed with alcohol abuse, continuous (Tr. 440, 444).

At two sessions in September 2010, Pappas's chief complaint was depression and anxiety (Tr. 462, 467). The attending nurse stated that Pappas's symptoms did not "carry an official diagnosis of anxiety disorder" (Tr. 462, 467). Pappas reported that his wife recently died, and that he relived her death several times every day (Tr. 467). He denied any "true panic attacks" and stated that he was not currently being treated for anxiety or had prior treatment for anxiety (Tr. 467). Pappas "admit[ted] to ETOH abuse" (Tr. 467), and he was drinking whiskey daily (Tr. 462, 469). A mental status examination showed a depressed and stressed mood/affect, intact recent and remote memory, and good insight and judgment (Tr. 464, 469). Pappas was diagnosed with depression with anxiety and given samples of Lexapro (Tr. 465, 469). He was also provided with information of mental health therapists (Tr. 465, 469). He was instructed to stop drinking (Tr. 465, 469).

When Pappas returned to Covenant Family Practice in December 2010, a mental status examination showed an appropriate affect and demeanor and grossly normal memory (Tr. 457, 460). This examination was unchanged in January and April 2011 (Tr. 525, 528). A ROS examination in December 2010 showed feelings of stress and in April 2011 was positive for depression (Tr. 457, 523). A ROS examination in July 2011 was negative for anxiety and depression (Tr. 520). Pappas stated that he drank 750ml of whiskey two times per week (Tr. 458, 521, 524, 527).

In February 2011, JoAnn Quintero, Ph.D., performed a consultative psychological examination (Tr. 478-86). Pappas stated that his wife developed pancreatic cancer within the

7

past two years, had surgery, and then passed away in April 2010 (Tr. 479). He stated that this period was very stressful for him (Tr. 479). He was "drinking excessively" when his wife died, but he currently drank two or three beers every three-to-four days (Tr. 479). He stated that he drank whiskey when he has trouble sleeping, but that he needed to "put a halter on whiskey" because he was drinking up to 600 ml in one night (Tr. 479). He began outpatient therapy a few months earlier and took Xanax as needed (Tr. 480). He reported serious thoughts of revenge toward some people and reported fleeting suicidal ideation with no intent or plan (Tr. 480). He described his mood as depressed, but denied any panic attacks (Tr. 480). Pappas showed mild impairment in terms of short-term memory and concentration, and no impairment in long-term or remote memory (Tr. 481). He was able to follow written and oral instructions, had good use of vocabulary and basic math skills, and had good capacity for abstract thinking and understanding (Tr. 481). Dr. Quintero stated that Pappas had a depressed mood, had a congruent affect, and was tangential throughout the interview (Tr. 481). Pappas stated that his hobby was making/cooking hot pepper oil and that he recently volunteered at a senior center (Tr. 482). Dr. Quintero diagnosed major depressive disorder, single episode, moderate; bereavement; alcohol dependence in partial sustained remission; and polysubstance dependence in sustained, full remission (Tr. 483). Dr. Quintero completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental), in which she opined that Pappas's mental impairments resulted in no more than mild work-related limitations (Tr. 484-86).

On July 21, 2011, Cynthia Rush, M.A., performed a consultative psychological examination (Tr. 541-43). Pappas reported that he drank a lot of alcohol before and after his wife's pancreatic cancer, but he was not "using alcohol as frequently as he was in 2010" (Tr. 542). Dr. Rush stated that Pappas had a depressed affect, but there were no signs of incoherence, blocking, circumstantiality, or loosening of associations (Tr. 542). There was no evidence of suicidal or homicidal ideation, hallucinations, or delusions (Tr. 542). Pappas earned a score of 28 out of 30 on the Mini-Mental Status Exam, which "suggest[ed] no significant impairment in mental status" (Tr. 543). Pappas had some difficulty with visual-spatial skills and short-term memory (Tr. 543). Dr. Rush diagnosed post-traumatic stress disorder; dysthymic disorder; and history of alcohol, marijuana, and narcotic abuse (Tr. 543).

In August 2011, Pappas returned to Covenant Family Practice and reported moderate depression for the past two years with symptoms including anhedonia, hypersomnia, fatigue, and sadness (Tr. 517). He was not currently taking any anti-depressants (Tr. 517). He also reported fleeting thoughts of suicide, but denied any plan (Tr. 517). He refused to take anti-depressants because he did not want to be made suicidal by the medication (Tr. 517). Pappas was drinking 250ml daily, possibly more (Tr. 517). A mental status examination showed a depressed and pessimistic mood/affect, intact recent and remote memory, and good insight

and judgment (Tr. 519). Pappas was diagnosed with moderate depression; it was noted that he refused treatment at that time (Tr. 519). He was also diagnosed with alcohol dependence, unspecified, continuous (Tr. 518-19).

In October 2011, Pappas reported no complaints of a mental impairment (Tr. 513). A mental status examination showed an appropriate affect and demeanor, intact recent and remote memory, and good insight and judgment (Tr. 515).

In November 2011, the most recent treatment record, Pappas's chief complaint was to discuss changing medications (Tr. 510). Pappas was drinking 250ml daily, possibly more (Tr. 510). A ROS examination was positive for feelings of stress due to his wife's death (Tr. 510). A mental status examination showed a depressed and pessimistic mood/affect, intact recent and remote memory, and good insight and judgment (Tr. 512).

On August 30, 2012, Cheri Premeau, Ph.D., prepared a letter regarding Pappas's mental health treatment (Tr. 574). Dr. Premeau stated that Pappas attended ten therapy sessions between October 2010 and May 2011 (Tr. 574). She stated that a tornado destroyed her home office and that she no longer had specific treatment records (Tr. 574). She stated that Pappas sought treatment secondary to the prolonged death of his wife (Tr. 574). She diagnosed Pappas with adjustment disorder with mixed anxiety and depressed mood and bereavement, and a personality disorder (Tr. 574). She stated that Pappas terminated treatment for unclear reasons (Tr. 574). She stated that Pappas's "psychological condition was relatively severe at the time of his entry into treatment," but that he had "mild to moderate symptoms" when he stopped treatment (Tr. 574).

### C. State Agency Medical Opinions

On November 12, 2010, Karla Montague-Brown, M.D., a state agency physician, reviewed the medical evidence of record and opined that Pappas did not have a severe physical impairment (Tr. 452-55). Dr. Montague-Brown identified treatment records through August 2010, including the stress test (Tr. 455).

On February 28, 2011, Charles S. Settle, M.D., a state agency physician, reviewed the evidence of record and affirmed Dr. Montague-Brown's opinion (Tr. 487). Dr. Settle noted that the evidence of record contained treatment records through December 2010, but that this evidence did "not indicate significant worsening of condition" (Tr. 487).

On April 4, 2011, Edward Sachs, Ph.D., a state agency psychologist, reviewed the medical evidence of record and completed a Psychiatric Review Technique form (Tr. 496-509). Dr.

Sachs stated that Pappas had major depressive disorder, moderate; bereavement; alcohol dependence in partial sustained remission; and polysubstance dependence in full remission (Tr. 499, 504), but that these impairments resulted in no more than mild limitations and, thus, were not severe (Tr. 496, 506). Dr. Sachs opined that "[w]hile the claimant is moderately depressed and grieving the loss of his wife, there is no indication of any significant loss of work related functioning" (Tr. 508).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must

"result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not

11

direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff first challenges the ALJ's finding at step two of the sequential evaluation process that his medically determinable physical impairments were not "severe." Plaintiff contends that x-ray results from June 10, 2004 (Tr. 577), and two occasions where he was diagnosed with low back pain (Tr. 515, 525) establish his low back pain as a severe impairment. Similarly, he argues that the mere diagnoses of labile hypertension, plantar fasciitis, and obesity reveal the ALJ's error in failing to find these impairments to be medically severe. (Docket Entry No. 14 at 3-4) Plaintiff misapprehends the nature of the severity requirement. The ALJ recognized that although the severity threshold has been described as a *de minimis* hurdle for the disability claimant to clear (Tr. 25), it nonetheless requires more evidence than the mere diagnosis of an impairment. Higgs v. Bowen, 880 F.2d 860, 862-63 (6th Cir. 1988). The limited medical evidence of each of these allegedly severe

impairments mentioned above was discussed in thorough fashion by the ALJ (Tr. 24-27), culminating in the following, well-supported finding:

> This evidence demonstrates that although the claimant has a number of medically determinable impairments, one is unable to discern a pattern where any of them, whether viewed singly or in combination, would result in more than a minimal degree of work-related limitation or that the same would be expected to last for one year or longer. Based on the above, I concur with the State agency assessments of Karla Montague-Brown, M.D. (Ex. 8-F), and Charles S. Settle, M.D., each of whom reached the view the claimant does not have a severe physical impairment, because there was little in the evidence which indicated a contrary view.

(Tr. 27) The proof which the ALJ referenced on his way to making this finding includes, e.g., notations of a brief period of low back pain in the wake of an automobile accident in 2007 (Tr. 25), and brief flares of low back pain in April and October of 2011 (Tr. 26); the single finding of plantar fasciitis in February 2010 (Tr. 26); descriptions of plaintiff's hypertension as "benign," "stable," and not indicative of any remarkable cardiovascular impairment (Tr. 25-26)[2]; and, a single notation of "a certain level of obesity" (Tr. 26).[3] Plaintiff has not cited any evidence, in the form of either clinical findings or medical opinions, which would undermine this finding of the nonseverity of plaintiff's physical

---

[2] Plaintiff's hypertension has also been diagnosed as "labile" on several occasions, but the treatment recommendation has been (in conjunction with his hypercholesterolemia) to effect lifestyle changes regarding diet and exercise, to supplement the medical management of these conditions. (E.g., Tr. 421-23, 426, 460, 465) These recommendations appear to have been largely ignored. Plaintiff has not identified any assessment of limitations owing to his hypertension.

[3] Although plaintiff cites a treatment note from August 3, 2011, wherein plaintiff "was diagnosed with obesity, with a [body mass index] of 33.5," in fact plaintiff was not diagnosed with obesity at this visit, but was noted to be "mildly obese" as a general observation during the physician's examination of him. (Tr. 519)

impairments. Accordingly, this argument has no merit.

Next, plaintiff summarily argues that the ALJ erred in failing to find that he suffered from major depression, dysthymic disorder, post-traumatic stress disorder (PTSD) and/or anxiety, in light of the diagnoses of these impairments and/or their symptoms by various sources. (Docket Entry No. 14 at 4) However, again, the mere diagnosis of an impairment says nothing about its medical severity or resulting functional limitations. The ALJ gave ample consideration to the symptoms and functional effects of depression and anxiety in considering plaintiff's case at step three of the sequential evaluation process, in particular against the backdrop of Listing 12.04 (Affective Disorders) (Tr. 31), and in considering the opinion evidence in order to determine plaintiff's mental RFC. In considering thee opinion evidence, the ALJ acknowledged that, "[t]o be certain, [plaintiff] was also grappling with the stresses of losing a spouse to a protracted illness, and in that setting, had developed depression and also symptoms of anxiety." (Tr. 34) The ALJ's consideration of the opinions of the consultative examiner, Dr. JoAnn Quintero, Ph.D., and of Cynthia Rush, M.A., the psychological examiner retained by the vocational rehabilitation department (Tr. 32), as well as the letter written by former treating psychologist Dr. Cheri L. Premeau, Ph.D. (Tr. 35), demonstrate his attention to the alleged depression and anxiety, and support his finding that plaintiff was, at worst, moderately limited by his mental impairments and symptoms when those symptoms are not exacerbated by alcohol consumption. This argument too is without merit.

Finally, plaintiff argues that the ALJ erred in finding that his substance use disorder was a contributing factor material to the determination of disability. Plaintiff

begins his challenge to the propriety of this finding on grounds that he was never appropriately diagnosed with a substance use disorder. This argument relies on the absence of such a diagnosis as a current and enduring impairment in the reports of Drs. Premeau and Quintero, as well as examiner Rush. However, Dr. Quintero and examiner Rush only examined plaintiff on one occasion, from which exposure Dr. Quintero diagnosed alcohol dependence in partial sustained remission (Tr. 483) and Ms. Rush diagnosed a history of alcohol abuse (Tr. 543). Moreover, Dr. Premeau's treatment records were destroyed in a tornado in 2011, leaving her to reconstruct the details of her treatment relationship with plaintiff from billing records and her own recollection, a year after that treatment relationship ended. (Tr. 574) The absence of a substance use diagnosis from her letter summarizing plaintiff's condition during their treatment relationship is thus hardly notable. What is notable is the diagnosis of alcohol dependence or abuse (continuous) by his treating providers at Covenant Family Practice (Tr. 440, 444, 519), as well as their repeated references to his being a "current alcoholic." (Tr. 415, 418, 421, 425, 428, 432, 436, 439, 443, 446) In short, the ALJ had ample evidence from which to find that plaintiff's alcohol abuse disorder was properly established during the relevant time period.[4]

---

[4] Plaintiff claims in his reply brief that it was error for the Appeals Council to reject the June 20, 2012 treatment note of Dr. Bruce Spinzig, which was generated two weeks after the ALJ's decision and documents plaintiff's "screening for alcoholism." (Docket Entry No. 18-1) In that note, Dr. Spinzig states that "having [cared] for Mr. Pappas since 2009 & knowing his previous history of excessive alcohol use during that time of his wife's terminal cancer illness, I see no current evidence of excessive alcohol use or abuse." Id. at 4. However, because the Appeals Council declined to decide the merits of plaintiff's case, their decision is not subject to review under 42 U.S.C. § 405(g), as it is not the final decision of the Commissioner of Social Security made after a hearing. See Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148 (6th Cir. 1996). Moreover, while plaintiff makes a passing attempt to secure a remand for further consideration of this treatment note under the sixth sentence of § 405(g), in the prayer for relief within his original brief (Docket Entry No. 14 at 11), he does not make any attempt to demonstrate the newness or materiality of that treatment note, nor good cause

Plaintiff concludes his challenge to the finding of alcohol abuse as a contributing factor material to the determination of disability by arguing that it is not possible to separate the limitations imposed by his alcohol abuse from the limitations imposed by his other mental impairments, and that a finding of materiality to the disability determination is therefore improper. However, separating such limitations is exactly what the ALJ is charged with doing in cases where, as here, the combination of limitations owing to substance use and other medically determinable impairments is disabling. See 20 C.F.R. § 404.1535. The ALJ here acknowledged the difficulty -- but not the impossibility -- of separating the two in this case, conducting a thorough "review of the medical evidence ... from the standpoint of the claimant's mental impairments, with particular attention toward the effects of his alcohol usage," which spans three pages of his decision (Tr. 34-36) and supports the finding that his inability to sustain concentration for at least two hours, reliably make work-related judgments, or persist at work with an ordinary break schedule would be remedied if he stopped abusing alcohol. He concluded his analysis as follows:

> In light of the above, it is not possible to use any item of opinion evidence and have it directly stand for the proposition that when the claimant abstains from drinking, he has one residual functional capacity, and when he doesn't, he has another. But the reason for the extended discussion is in order to show that a clear picture does indeed emerge from the evidence and from the record as a whole, even if a specific exhibit should fail to tell the whole story. And the picture that emerges is one where the claimant has often–and at times, quite frequently --engaged in excessive drinking, with a substantial amount of it arguably attributable to a traumatic event. His consultative and psychological examination reports tend to show,

---

for his failure to procure and submit it prior to the ALJ's decision, as required to justify a sentence six remand. Cline, 96 F.3d at 148-49. Accordingly, no further review of the matter is warranted.

however, that when he operates in the setting of sobriety, and even if that period of sobriety proves to be brief or temporary, he presents as a person of average to above-average cognitive functioning who, at *minimum,* is capable of simple tasks as described in the above residual functional capacity, who has the interpersonal capabilities to allow for such work, and who is able to sustain concentration and persistence at levels ordinarily accepted by business and industry for such work. For in carefully reviewing the evidence of record, one is not able to find any substantial evidence that would conform to a different view.

(Tr. 36)

The undersigned finds the ALJ's determination of the materiality of plaintiff's alcohol abuse to the determination of disability, as well as his ultimate finding that plaintiff is therefore not disabled, to be supported by substantial evidence on the record as a whole. The agency decision must therefore be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 25th day of February, 2015.

                                                            s/ John S. Bryant
                                                           JOHN S. BRYANT
                                                           UNITED STATES MAGISTRATE JUDGE